REPUBLICAN MOUNTAIN SILVER MINES, Limited, et al. v. BROWN et al.

(Circuit Court of Appeals, Eighth Circuit. October 30, 1893.)

No. 290.

1. FOREIGN CORPORATIONS—DISSOLUTION—EQUITABLE JURISDICTION.

The circuit court has no inherent power, as a court of equity, at the suit of domestic shareholders, to dissolve an English mining company, owning and operating a mine in the United States, and to wind up its business operations; nor has it any such power under the act of parliament known as the "Companies Act 1862."

2. SAME—INVALID RESOLUTION—RECEIVERS.

The fact that a resolution to wind up a foreign company was confirmed at a meeting of shareholders held on insufficient notice, is no ground for the appointment of a receiver by the circuit court. Adequate relief may be afforded, where the defendants submit themselves to the jurisdiction of the court, by a decree declaring the resolution invalid, and enjoining the defendants from carrying it into effect.

3. SAME—CONFLICT BETWEEN ACT AND ARTICLES OF ASSOCIATION.

Where the articles of association of an English company are in conflict with the act of parliament under which the company was organized, the act of parliament must prevail.

4. SAME.

A provision in articles of association of an English company that the company may amalgamate its business with, or transfer its business or property to, any similar undertaking or company, does not relate to the same kind of proceeding as that provided in section 51 of the "Companies Act 1862," for the voluntary winding up of a company, and consequently is not in conflict with that act, although they differ as to the time prescribed by each for the confirmatory meeting of shareholders required. 55 Fed. 7, reversed.

5. SAME—EQUITABLE JURISDICTION.

A circuit court, as a court of equity, should not interfere, at the suit of shareholders in the United States of an English mining company operating a mine in the United States, to restrain proceedings by English shareholders to wind up the company, merely on account of the motives

which may have inspired their conduct, so long as their action was strictly in accordance with English laws, and not in violation of the company's charter or by-laws. 55 Fed. 7, reversed.

Appeal from the Circuit Court of the United States for the District of Colorado.

In Equity. Bill filed by J. Warren Brown and Porter P. Wheaton against the Republican Mountain Silver Mines, Limited, Edward F. Tremayne, Horace H. Atkins, A. P. Welch, John Welch, and Arthur E. Phillips, for the dissolution of the corporation defendant, the appointment of a receiver, and for other relief. Decree for complainants. 55 Fed. 7. Defendants appeal. Reversed

Statement by THAYER, District Judge:

This was a bill filed by the appellees against the Republican Mountain Silver Mines, Limited, and its directors, and also against Edward F. Tremayne, its secretary, who had been appointed liquidator to wind up the affairs of the corporation. The bill averred, in substance, that the defendant company was a corporation organized and existing under the laws of Great Britain, with its principal office in the city of London, England, but that its mining property, consisting of numerous mining lodes or claims, was all situated in the state of Colorado; that the capital stock of the company consisted of 100,000 deferred shares and 50,000 ordinary shares of the nominal value of one pound each, and that the great majority of said shares were owned by the appellees, and by other American shareholders, not named as complainants, but in whose behalf the bill purported to have been filed; that within the eight years preceding the filing of the bill the defendant company had remitted from England less than $18,000 for the working of its mines; that prior to December, 1889, it had become indebted to a bank in the state of Colorado for money borrowed to conduct certain mining operations, and that on the 11th of December, 1889, the bank had recovered a judgment therefor in the sum of $4,353 and costs, which judgment was subsequently assigned to A. P. Welch, who was chairman of the company's board of directors, he having advanced the money wherewith to pay said judgment; that in the year 1890 the defendant company, in pursuance of a resolution of its board of directors, had executed two deeds of trust on all of its mining property in Colorado for the purpose of securing two notes, which had been drawn in favor of said A. P. Welch; and that under the terms of said deeds of trust the property covered thereby might be sold on 30 days' notice if the sum due on said notes was not paid at maturity. The bill averred that said deeds of trust in favor of said Welch were executed without authority, for the purpose of acquiring title to the property of the company, in fraud of the rights of the majority of the shareholders; but it did not appear from any other allegations of the bill, or from the testimony produced at the trial, in what respect the deeds of trust were unauthorized, or that the indebtedness thereby secured was not justly due and owing to the party in whose favor they were ordered to be executed. The bill further averred, in substance, that on the 16th day of June, 1891, an extraordinary meeting of the shareholders was held in London, England, in pursuance of a notice theretofore given, for the purpose of appointing a liquidator under English laws to wind up the affairs of the corporation, but that the notice of such meeting was not sent to or received by the appellees and other American shareholders in time to attend the same. That at such meeting a resolution was passed that the company be wound up. That Edward F. Tremayne, who is named as defendant, be appointed liquidator of the company; and that he be vested with authority to sell the property and business thereof to any other corporation, and to receive in payment therefor shares in such other corporation, for the purpose of making a distribution of the same among the shareholders of the defendant company. That after the passage of such resolution a subsequent extraordinary general meeting of the shareholders was appointed to be held on July 1, 1891, at London, England, for the purpose of confirming, according to English laws, the reso-

lution that had been adopted at the prior meeting of June 16, 1891. That only 16 days' notice was given of such confirmatory meeting of July 1, 1891, which was insufficient to enable the appellees, or any of the American stockholders, to be present, whereas a by-law of the defendant company expressly required that no such confirmatory meeting should be held to approve a resolution for the winding up of the company, within less than 30 days after the first meeting at which such resolution should be proposed and adopted. That at such second meeting, held on July 1, 1891, as well as at the prior meeting, none of the American shareholders were in fact present or were represented, but that the resolution of June 16, 1891, was nevertheless reenacted and confirmed. The bill further charged that the adoption of said resolution under the circumstances aforesaid was in violation of the by-laws of the company, and was also a violation of English laws, but that, whether or not such action was within the letter of any English statute it was nevertheless fraudulent, because the several meetings had been held with knowledge that the American shareholders, who held a large majority of the stock, could not attend or be represented. The bill also charged that the liquidator appointed by the company to wind up its affairs was financially irresponsible, and that one of the appellees (J. Warren Brown) claimed to be a creditor as well as a stockholder of the defendant company, and that his claim was then in litigation. The testimony showed that the litigation had resulted in a final judgment in favor of the company. In view of the premises, the complainants below prayed that the members of the board of directors who had been made parties, and said Edward F. Tremayne, might be severally enjoined from selling or disposing of any of the defendant company's property; that said Tremayne might be restrained from taking any proceedings whatever as liquidator to wind up the affairs of the company; that a receiver might be appointed to take charge of all of the company's property in Colorado, and that he be authorized to sell and dispose of the same to the end that the defendant company might be dissolved and wound up for the benefit of all of its stockholders and creditors. On final hearing the circuit court sustained the bill, and granted substantially all of the relief that was prayed for therein. From such decree granting an injunction and appointing a receiver with a view of dissolving and winding up the company the defendants below have prosecuted an appeal to this court.

Charles E. Gast, for appellants.

R. S. Morrison and Willard Teller, for appellees.

Before CALDWELL and SANBORN, Circuit Judges, and THAYER, District Judge.

THAYER, District Judge, after stating the case as above, delivered the opinion of the court.

It is made apparent by an inspection of the bill of complaint that it states no case entitling the complainants to any form of equitable relief, unless the right thereto can be maintained on the strength of the allegation that the shareholders' extraordinary general meeting of July 1, 1891, was an unauthorized meeting, because it was convened and held on insufficient notice under the charter and by-laws of the company. Unless that averment is sustained, we are unable to see that the complainants had any fair pretense for invoking the aid of a court of chancery to restrain the proceedings that were about to be taken by the English liquidator, in conformity with English laws, for the purpose of disposing of the property of the company, and winding up its affairs.

The corporation owed its existence to the laws of Great Britain. It held all of its property and franchises under and subject to the laws of that kingdom relative to the "incorporation, regulation,

and winding up of trading companies and other associations," to which class of corporations it evidently belonged. Those laws entered into and formed a part of the defendant company's charter; and every shareholder not only had notice thereof and assented thereto when he became a member of the company, but he impliedly agreed that the company might be wound up in accordance with the provisions of such statutes, if it was thought proper to go into liquidation, and if a resolution to that effect was duly enacted. These principles must be regarded as sufficiently established by the decision in Relfe v. Rundle, 103 U. S. 222, 226. See, also, Railway Co. v. Gebhard, 109 U. S. 527, 3 Sup. Ct. 363.

The jurisdiction that a court of equity may lawfully exercise over the affairs of an ordinary business corporation, in the absence of any statute conferring extraordinary powers, is likewise well defined. A court of chancery may, at the instance of a stockholder, and if the company itself refuses to move, lawfully entertain a bill to depose or to restrain the officers or directors of a corporation, when it appears that in their capacity as agents or trustees of the stockholders they have committed, or are about to commit, acts that are tantamount to a breach of trust, whether such acts consist of fraudulent dealings with the corporate property or funds, or whether they consist in engaging the corporation in enterprises that are beyond the scope of its chartered powers. In more general phrase, it is sometimes said that a court of chancery may grant equitable relief against a corporation, at the suit of an individual, "whenever a sufficient case for relief is shown upon ordinary principles of equity jurisprudence." Mor. Corp. § 1042, and citations; Dodge v. Woolsey, 18 How. 331, 341; Zabriskie v. Railroad Co., 23 How. 381, 385, 386; Peabody v. Flint, 6 Allen, 52; March v. Railroad Co., 40 N. H. 548; Robinson v. Smith, 3 Paige, 222. But a court of equity has no power to interpose its authority for the purpose of adjusting controversies that have arisen among the shareholders or directors of a corporation relative to the proper mode of conducting the corporate business, as it may do in case of a similar controversy arising between the members of an ordinary partnership. Corporations are in a certain sense legislative bodies. They have a legislative power when the directors or shareholders are duly convened that is fully adequate to settle all questions affecting their business interests or policy, and they should be left to dispose of all questions of that nature without applying to the courts for relief. A stockholder in a corporation cannot successfully invoke the power of a chancery court to control its officers or board of managers, or to wrest the corporate property from their charge through the agency of a receiver, so long as they neither do nor threaten to do any fraudulent or ultra vires acts, and so long as they keep within the limits of by-laws which have been prescribed for their governance. If in either of the cases last specified a stockholder is nevertheless dissatisfied with the business policy that is being pursued, or the methods of corporate management, he must seek redress within the corporation, in

the mode prescribed by its charter and by-laws, rather than by an appeal to the courts. Hawes v. Oakland, 104 U. S. 450; Oglesby v. Attrill, 105 U. S. 605, 610; French v. Gifford, 30 Iowa, 148; Foss v. Harbottle, 2 Hare, 461. Moreover, the doctrine is very well established that a court of equity has no power at the suit of an individual to decree the dissolution of a domestic corporation, and a winding up of its affairs, unless such extraordinary power has been conferred upon it by the terms of some statute. The better view undoubtedly is that at common law no such power to decree a surrender or forfeiture of corporate franchises was vested in courts of equity, to be exercised at the suit of an individual, although some courts have upheld the right of a court of chancery to exercise that power when invoked by the state through its attorney general. Folger v. Insurance Co., 99 Mass. 267, 274; Slee v. Bloom, 5 Johns. Ch. 366, 377; French v. Gifford, 30 Iowa, 148; Attorney General v. Railroad Co., 35 Wis. 425, 511; Mor. Corp. § 1040.

It is hardly necessary to remark that if courts of equity, at the suit of a shareholder, and in the absence of a statute, have no jurisdiction to dissolve a domestic corporation, and to wind up its affairs, much less can they exercise such powers with respect to a foreign corporation. It has, indeed, been held on much consideration that the courts of a state have no visitorial powers over foreign corporations doing business within the state, unless such power is expressly conferred by local statutes; and for that reason it was ruled by the supreme court of Maryland that it would not entertain a proceeding by a citizen of Maryland, who was a shareholder in a foreign company, to compel it to annul an alleged wrongful forfeiture of his stock, and to reinstate him as a stockholder. Mining Co. v. Field, 64 Md. 151, 20 Atl. 1039. See, also, Wilkins v. Thorne, 60 Md. 253.

In view of the foregoing principles, it is evident, we think, that the decree of the circuit court was erroneous in so far as it contained provisions which contemplated a sale of all of the defendant company's property in the state of Colorado, and a general liquidation of its affairs. As we have already shown, the circuit court had no inherent power, as a court of equity, to dissolve the company, and to wind up its business operations. It had no authority to enter a decree of that nature under any existing statute of the state of Colorado to which our attention has been directed, and it can hardly be pretended that it derived or could derive any such power or jurisdiction from the act of parliament under which the corporation was organized. The trial court appears to have been of the opinion that the resolution to wind up the company which was adopted at the meeting of June 16, 1891, and was confirmed at the meeting of July 1, 1891, was void, for the reason that the latter meeting was held on insufficient notice; but, if we accept that view as sound, it is nevertheless apparent that there was no occasion for the appointment of a receiver to hold and dispose of the company's property, or for the order directing

him to inquire and to report in what manner the property in question could be most advantageously sold. As all of the defendants, including the foreign liquidator, had joined in an answer to the bill, and had thereby submitted themselves to the jurisdiction of the court, we think that adequate relief would have been afforded for the injury complained of,—if the trial court had simply declared the invalidity of the resolution to wind up the company, and had thereupon enjoined the defendants from taking any action to carry the same into effect. An injunction in the form last suggested would have been all-sufficient to prevent the threatened wrong, even if the resolution to wind up the company was in fact void; and we are unable to see that the record discloses any fact or circumstance which rendered an order for the appointment of a receiver and for the sale of the company's property either a necessary or a proper order.

It is insisted, however, that the resolution to wind up the company was neither void nor irregular, but was passed in strict conformity with English laws; and this contention on the part of the appellants compels us to make a brief reference to the company's articles of association, and to some provisions of the act of parliament under which the defendant company was organized. It is not denied that the act of parliament last referred to permitted the defendant company to go into voluntary liquidation in the manner contemplated by the resolution adopted at the shareholders' meeting of June 16, 1891, which was subsequently confirmed. The act of parliament provides that a company organized under the act may be wound up "whenever the company has passed a special resolution requiring the company to be wound up voluntarily;" it further provides, in substance, that the liquidator appointed by the shareholders to wind up the company may be authorized to transfer the business and property of the company to another company, and in payment therefor receive shares in such other company for distribution among the shareholders of the company whose affairs are being liquidated. Vide Companies Act 1862, §§ 129, 161. The act further defines a *special* resolution to wind up a company to be, in substance, one which has first been passed at a general meeting of shareholders, and has been confirmed at a subsequent general meeting, "of which notice has been duly given and held at an interval of not less than fourteen days nor more than one month from the date of the meeting at which such resolution was first passed." Vide Id. § 51. The resolution over which the controversy arises in the present case appears to have been passed and to have been subsequently confirmed in strict conformity with the provisions of the companies act above cited, both as respects the method of calling the meetings at which the resolution was proposed and adopted and as respects the notice given to shareholders of said meetings and the time within which they were to be held. It is contended, however, that although the second meeting was held within the period prescribed by section 51 of the companies act, to which we have alluded,—that is to say, not less than fourteen days nor more than one month from the date

of the first meeting,—yet that it was not held within the period prescribed by section 136 of the defendant company's articles of association. An obvious answer to this contention is, that if the articles of association are in conflict with the act of parliament under which the company was organized, the act of parliament must prevail. Section 136 of the articles of association provides, in substance, that the company "may amalgamate its business with, or transfer its business and property to, any similar undertaking or company, or purchase or acquire the business or property of any company * * * carrying on a business similar to that of the defendant company, upon such terms as may be agreed upon, * * * and may pay for any business so acquired either in cash or in shares," etc., provided a resolution to that effect is passed by a three-fourths vote at an extraordinary general meeting, and is confirmed at a second meeting, held "not less than one month nor more than three months thereafter." It is obvious that if section 51 of the companies act and section 136 of the articles of association relate to the same kind of a proceeding or transaction, they are in conflict, because they prescribe a different period within which the confirmatory meeting must be held, and the companies act in that event must prevail. We think, however, that they relate to entirely different transactions. The companies act has reference to a proceeding to wind up a corporation whereby the corporation disposes of all of its property, surrenders its franchises to the crown, and thereby ceases to exist as a legal entity. On the other hand, the articles of association have reference to a proceeding whereby a corporation merely becomes consolidated with some other company doing a similar business, or purchases the property or business of some other company, in which case it neither surrenders its franchise nor ceases to exist. Under the provision contained in the company's articles of association it was intended no doubt that it might unite its business with that of any other company or firm that was engaged in similar enterprises by a simple agreement with such other company that had first been confirmed by the defendant company's members; but in a proceeding taken under the companies act to wind up a corporation it is necessary to appoint a liquidator to dispose of its property, and to effect a valid surrender of its corporate franchises. In view of what has already been said on this branch of the case, the necessary conclusion is that the meeting of July 1, 1891, was properly convened and held under the terms of the statute under which the defendant company was organized, and the resolution passed at such meeting was neither void nor irregular by reason of any provision found in the defendant company's articles of association.

We have not overlooked the charge contained in the bill that the two meetings held in London were intentionally called by the English shareholders on short notice for the express purpose of preventing the American shareholders from taking part in such meetings. With reference to that charge, and without deciding whether it is true or false, it is sufficient to say that the company's articles of

association gave all foreign shareholders the right to name an address at any place in the United Kingdom, to which notices of all meetings were required to be sent, and the right to appoint an agent at such place to represent their interest at any meeting or meetings that might be held. Furthermore, the foreign shareholders were bound to take notice of the law under which the company was organized, and of the various provisions to which we have already referred that enabled the company to be wound up on short notice by a resolution passed at a shareholders' meeting and confirmed at a subsequent meeting. It is furthermore disclosed by the record that the English and American shareholders had been pulling at cross purposes for some years prior to June, 1891, and that the controversy between them was largely due to the fact that the English shareholders had contributed practically all of the funds to prosecute the business of the company while the American shareholders possessed the superior voting power. But, aside from these considerations, we think that a court of equity should not interfere merely on account of the motives that may have inspired the conduct of the English shareholders, so long as the action taken by them was strictly in accordance with English laws, and was not in violation of any provision of the company's charter or by-laws. Oglesby v. Attrill, 105 U. S. 605.

The result is that we have been constrained to disapprove of all of the provisions of the decree from which the present appeal was taken. The decree of the circuit court is accordingly reversed, and the case is remanded to that court with directions to discharge the receiver, and to vacate its former decree, and to enter an order dismissing the bill of complaint at the complainants' costs.